UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-cv-24745-ALTMAN/Lett

ACCESSNINJA, INC. *d/b/a*
ACCESSGRID,

     *Plaintiff,*

*v.*

PASSNINJA, INC. and RICHARD
GRUNDY,

     *Defendants.*

_____/

PASSNINJA, INC. and RICHARD
GRUNDY,

     *Counter-Plaintiffs,*

*v.*

AUSTON BUNSEN, HF0 ADVISORS, LLC,
and ACCESSNINJA, INC.

     *Counter-Defendants.*

_____/

## ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS

This action arose out of a dispute between two businesses in the Near Field Communication ("NFC") industry. The Plaintiff, AccessNinja, says that the Defendants "willfully and unlawfully copied and exploited [AccessNinja's] propriety software code that [AccessNinja] founder . . . Auston Bunsen wrote." Amended Complaint [ECF No. 57] ¶ 3. The Defendants—rival business PassNinja and its founder, Richard Grundy—promptly filed their own counterclaims against AccessNinja, Bunsen, and third-party HF0 Advisors, LLC. These Defendants/Counter-Plaintiffs allege that the Counter-Defendants misappropriated PassNinja's proprietary source code for their own gain. *See*

Amended Counterclaim [ECF No. 68] ¶ 55 ("When filing the Fraudulent Copyright Application, Bunsen and AccessNinja intentionally failed to disclose to the copyright office that . . . [Bunsen's work] was derived from PassNinja's code and contains multiple references to PassNinja's pre-existing work created by and exclusively for PassNinja.").

HF0 now moves to dismiss the counterclaims against it under Rules 12(b)(2) and 12(b)(6), arguing that we lack "personal jurisdiction over HF0, a California-based Delaware limited liability company" and, in the alternative, that Counts I, II, VI, VII, VIII, and XI of the Amended Counterclaim fail to state a claim against it. Motion to Dismiss Counterclaim ("MTD") [ECF No. 71] at 2.[1] After careful review, we find: (1) that we have personal jurisdiction over HF0; and (2) that only some of the Counter-Plaintiffs' claims fail to state a claim upon which relief may be granted. We therefore **GRANT in PART** and **DENY in PART** the MTD.

THE FACTS[2]

PassNinja was formed on August 15, 2019, as a "spin-off" from Flomio, Inc.—a Delaware corporation *also* founded by Grundy in May 2011. *See* Amended Counterclaim ¶¶ 16–18. PassNinja was "focused on developing portable NFC hardware compatible with mobile devices" and

---

[1] The MTD has been fully briefed and is ripe for adjudication. *See* Response in Opposition to HF0 Advisors, LLC Motion to Dismiss ("Response") [ECF No. 82]; Reply in Support of Motion to Dismiss ("Reply") [ECF No. 87].

[2] The factual allegations we're about to recount are *very different* from those alleged by AccessNinja in its Amended Complaint. *See generally AccessNinja, Inc. v. PassNinja, Inc.*, 2025 WL 753332, at *1–2 (S.D. Fla. Mar. 10, 2025) (Altman, J.). AccessNinja's version of events, in a nutshell, is that Bunsen "began writing programming code for [NFC] technology in early 2023" and that he allowed the Defendants to use his code "in exchange for [51%] of the stock in PassNinja." *Id.* at *1 (cleaned up). When that deal fell through around August 2024, Bunsen "decided to build his own business" (AccessNinja) and then successfully registered his work with the U.S. Copyright Office. *Ibid.* (cleaned up). Although Bunsen "revoked the limited authorization [he] had previously granted to [the Defendants]" to use his code, he offered the Defendants an "opportunity to license" his work. *Id.* at *2. Instead, the Defendants "copied and exploited [Bunsen's code] for their own commercial purposes." *Ibid.* (cleaned up). Here, however, "[w]e accept the factual allegations in the [Amended Counterclaim] as true and make all reasonable inferences in favor of the non-moving party" (*i.e.*, the Counter-Plaintiffs). *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1070 (11th Cir. 2004).

successfully "created the first NFC reader designed for the iPhone[.]" *Id.* ¶¶ 18–19. PassNinja's "copyrighted software" was created sometime in 2020—many years before "Bunsen's involvement" with PassNinja. *Id.* ¶ 26; *see also* PassNinja Certificate of Registration [ECF No. 68-1] at 107–08.[3]

"Bunsen's significant involvement with PassNinja began in February 2023 after Bunsen proposed to contribute to PassNinja's development under a mutual agreement." *Id.* ¶ 27. On February 9, 2023, Bunsen and Grundy executed an informal agreement over email, where Bunsen agreed "to work on PassNinja . . . in exchange for . . . 51% of the company stock vested over 4 years with a cliff that occurs at 100 net new paying customers or 9 months of active code development, whichever happens sooner." Feb. 9, 2023, Email [ECF No. 68-1] at 16. The parties agreed that the February 9, 2023, Email would operate "as a gentlemen's agreement until we execute actual legal docs later this year." *Ibid.* PassNinja "gave Bunsen access to [its] system, its propriety developer relationship, and existing codebase." Amended Counterclaim ¶ 30. Bunsen was also given a PassNinja email address, which he used "to represent PassNinja in dealings with investors like HF0, customers like ItsWare, partners like Apple/Google, and suppliers[.]" *Id.* ¶ 32.

In early August 2024, "investor group HF0 invited PassNinja to interview for a $1,000,000.00 investment opportunity and residency where HF0 would also provide tools, staff, officers and other resources for developing PassNinja's business[.]" *Id.* ¶ 34. Bunsen and Grundy traveled to San Francisco to interview with HF0 on August 19, 2024. *See id.* ¶ 35. The interview "went well," and, on August 23, 2024, HF0 "notified Bunsen of their intention to provide resources, temporary residency and invest $1,000,000.00 in PassNinja and provided terms requiring a response within twenty-four (24) hours." *Id.* ¶¶ 34, 36. Bunsen and Grundy reacted to the news differently. Bunsen wanted "to accept the offer immediately[,]" "relocate to San Francisco for several months to . . . participate in the

---

[3] Although PassNinja's Certificate of Registration indicates that the work was completed in 2020, the effective date of the registration is December 2, 2024. *See* PassNinja Certificate of Registration at 107.

HF0 residency[,]" and to begin working at PassNinja full-time. *Id.* ¶ 38. Grundy, on the other hand, "voiced several concerns" and wanted to table the discussion until he "return[ed] to Miami on September 2, 2024, after a planned camping trip." *Id.* ¶ 40. Bunsen "seemingly agreed to moved forward as well and wished Grundy a good trip." *Id.* ¶ 41. But on August 26, 2024, while Grundy was away, Bunsen formed AccessNinja. *See id.* ¶ 47.

Things escalated after Grundy returned. When Bunsen and Grundy finally met on September 6, 2024, "Bunsen presented Grundy with an ultimatum: either sell Grundy's stake in PassNinja to Bunsen or agree to dissolve PassNinja." *Id.* ¶ 42. Bunsen revealed "that HF0 was only willing to invest with him so he would be taking the HF0 investment with another company that would not [sic] exclude Grundy and PassNinja." *Id.* ¶ 43. "[U]nbeknownst to Grundy or PassNinja[,] Bunsen had already planned with HF0 to set up a copycat company, exploiting the programming code and customer contacts Bunsen had developed while working with PassNinja, and using the HF0 investment and HF0 resources and control." *Id.* ¶ 44. Two days later, on September 8, 2024, Bunsen and HF0 conspired to "crippl[e] key PassNinja systems" by deleting some of PassNinja's "critical assets." *Id.* ¶ 46. Having now left PassNinja for good, Bunsen (through AccessNinja) "file[d] an application with the Copyright Office of the work he allegedly did while working on PassNinja," even though this work "was derived from PassNinja's code and contains multiple references to PassNinja's pre-existing work created by and exclusively for PassNinja." *Id.* ¶ 55.

The Counter-Plaintiffs (that is, PassNinja and Grundy) have brought fourteen total counterclaims—seven of which (Counts I, II, V, VI, VII, VIII, and XI) implicate HF0. Counts I and II allege contributory and vicarious copyright infringement against all the Counter-Defendants (including HF0). *See id.* at 14, 17. Counts V and VI contend that the Counter-Defendants engaged in

4

unfair competition under the Lanham Act and Florida common law. *See id.* at 23, 25.[4] Count VII accuses the Counter-Defendants of misappropriation, in violation of Florida's Uniform Trade Secrets Act ("FUTSA"). *See id.* at 27. Count VIII asserts that HF0 tortiously interfered with "PassNinja's existing and future business relationships[.]" *Id.* ¶ 157. Finally, Count XI alleges that all the Counter-Defendants "were unjustly enriched by their use of the PassNinja Assets." *Id.* ¶ 186.

## THE LAW

Federal Rule of Civil Procedure 12(b)(2) permits a defendant to move to dismiss a claim for lack of personal jurisdiction. "The determination of personal jurisdiction over a nonresident defendant requires a two-part analysis by the federal courts." *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 855 (11th Cir. 1990). *First*, the court must satisfy itself that the exercise of personal jurisdiction comports with the forum state's long-arm statute. *See Proudfoot Co. World Headquarters L.P. v. Thayer*, 877 F.2d 912, 919 (11th Cir. 1989). *Second*, the court must ensure that the exercise of jurisdiction is consistent with the requirements of the Fourteenth Amendment's Due Process Clause. *See Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1214 (11th Cir. 1999). "Subjecting [a defendant] to jurisdiction in Florida comports with due process so long as 'minimum contacts' exist between [the defendant] and Florida and exercising jurisdiction does not offend traditional notions of fair play and substantial justice." *Id.* at 1220 (cleaned up).

---

[4] HF0 didn't move to dismiss Count V. *See generally* MTD. We therefore agree with the Counter-Plaintiffs that "HF0 has waived any argument regarding dismissal as to Count V." Response at 6; *see also United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) (en banc) ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court *sua sponte* [only] in extraordinary circumstances."); *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority."); *Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue waives it."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived.").

Under Florida law, "[a] plaintiff seeking to obtain jurisdiction over a non-resident defendant initially need only allege sufficient facts to make out a prima facie case of jurisdiction." *Id.* at 1214 (cleaned up). "[The] Plaintiff's burden in alleging personal jurisdiction is to plead sufficient material facts to establish the basis for exercise of such jurisdiction." *Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249 (11th Cir. 2000). If a plaintiff pleads sufficient "material facts" to support the exercise of personal jurisdiction, the burden then shifts to the defendant to challenge the plaintiff's allegations by affidavits or other competent evidence. *Id.* at 1249. If "a nonresident defendant raises a meritorious defense to personal jurisdiction through affidavits, documents or testimony," the plaintiff must then establish the propriety of jurisdiction by affidavits, testimony, or other documents. *Am. Airlines, Inc. v. Despegar.com USA, Inc.*, 2014 WL 11880999, at *3 (S.D. Fla. May 14, 2014) (Altonaga, J.) (cleaned up). In other words, the "district court must accept the facts alleged in the complaint as true, to the extent that they are uncontroverted by the defendant's affidavits." *Cable/Home*, 902 F.2d at 855 (cleaned up). But where "the parties' affidavit and deposition evidence conflict, the district court must construe all reasonable inferences in favor of the plaintiff." *Ibid.*

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To meet this "plausibility standard," a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). The standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). "[T]he standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the required element." *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309–10 (11th Cir. 2008) (quoting *Twombly*, 550 U.S. at 545). "The plausibility standard is not akin to a

'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. On a motion to dismiss, "the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016). "The motion is granted only when the movant demonstrates that the complaint has failed to include 'enough facts to state a claim to relief that is plausible on its face.'" *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016) (quoting *Twombly*, 550 U.S. 544, 570 (2007)).

## ANALYSIS

### I.    Personal Jurisdiction

HF0 first argues that we must dismiss it from the case "as the Court's exercise of jurisdiction over it would be inconsistent with due process." MTD at 4. HF0 concedes that Florida's long-arm statute applies because the Counter-Plaintiffs allege that HF0 "commit[ted] a tortious act within [Florida]." *Id.* at 6 (quoting FLA. STAT. § 48.193(1)(a)(2)); *see also Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1353 (11th Cir. 2013) ("[U]nder Florida law, a nonresident defendant commits 'a tortious act within Florida' when he commits an act outside the state that causes injury within Florida." (citing *Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th Cir. 2008))). But, HF0 continues, we can't exercise specific personal jurisdiction over it under the long-arm statute without offending due process for two reasons. *One*, the Counter-Plaintiffs fail to allege a "factual connection" between "HF0's investment decisions and any allegedly wrongful conduct connected to Florida." MTD at 8. *Two*, the Counter-Plaintiffs can't show that HF0 engaged in "intentional, direct, and purposeful acts . . . aimed at Florida[.]" *Id.* at 9. The Counter-Plaintiffs respond that their allegations are sufficient to show that "HF0 maintains substantial, continuous, and systemic corporate activity in the Southern District of Florida" by "actively support[ing] AccessNinja and Bunsen's unlawful operations in Florida[.]"

Response at 2–3. We agree with the Counter-Plaintiffs and find that we can exercise personal jurisdiction over HF0 without offending due process.[5]

"The Due Process Clause of the Fourteenth Amendment protects a party from being subject to the binding judgment of a forum with which it has established no meaningful 'contracts, ties, or relations.'" *Del Valle v. Trivago GmbH*, 56 F.4th 1265, 1274 (11th Cir. 2022) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)). Put another way, "due process prohibits the exercise of personal jurisdiction over a nonresident defendant unless its contacts with the state are such that it has fair warning that it may be subject to suit there." *Id.* at 1275. Courts in the Eleventh Circuit use a "three-part due process test, which examines: (1) whether the plaintiff's claims 'arise out of or relate to' at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant 'purposefully availed' himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with 'traditional notions of fair play and substantial justice.'" *Mosseri*, 736 F.3d at 1355 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–75 (1985)).

"The plaintiff bears the burden of establishing the first two requirements, and then the burden shifts to the defendant to establish that our exercise of jurisdiction would offend principles of fair play and substantial justice." *ECB USA, Inc. v. Savencia Cheese USA, LLC*, __ F.4th ___, 2025 WL 1872779, at *3 (11th Cir. July 8, 2025). Because HF0 never argues that the exercise of personal jurisdiction

---

[5] The parties also quibble over whether we can exercise "general personal jurisdiction" over HF0. We have general personal jurisdiction over a limited liability company if its "place of incorporation [or] principal place of business" is in Florida. *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). HF0 says that it "is a Delaware limited liability company with its principal place of business in San Francisco, California." MTD at 6 (citing Declaration of Emily Liu ("Liu Decl.") [ECF No. 71-1] ¶ 4). The Counter-Plaintiffs insist that Liu's declaration is "perjurious" and that HF0 previously represented to the State of Florida, PassNinja, and the public that its "principal place of business is in Hollywood[,] Florida." Response at 2; *see also, e.g.*, 2024 Foreign Limited Liability Company Annual Report [ECF No. 68-1] at 27 (listing "current principal place of business" as Hollywood, Florida). Since we can constitutionally exercise specific personal jurisdiction over HF0, we express no opinion on whether we *also* have general personal jurisdiction over HF0.

wouldn't comport with "fair play and substantial justice," *see generally* MTD; Reply, we'll limit our analysis to the first two prongs of this three-part test.

 *First*, the Counter-Plaintiffs have shown that their counterclaims "arise out of or relate to one of [HF0's] contacts with [Florida]." *Del Valle*, 56 F.4th at 1275 (cleaned up). This prong "focuses on the causal relationship between the defendant, the forum, and the litigation[,]" but there need not be "direct causation" between "the defendant's forum conduct" and the plaintiff's claims. *Ibid.* (cleaned up) (citing *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021)). Here, the Counter-Plaintiffs allege that HF0 contacted Bunsen and Grundy—two Florida citizens—"to interview for a $1,000,000.00 investment opportunity and residency" based on "PassNinja's copyrights, trademarks, and trade secrets." Amended Counterclaim ¶ 34. When Grundy didn't immediately accept HF0's investment offer, HF0 and Bunsen "schemed together to take the PassNinja assets and engage in lawfare, corporate sabotage and cyber-attacks directed at PassNinja and PassNinja's customers." *Id.* ¶ 44. Richard Grundy's sworn declaration confirms that HF0's employees contacted him and Bunsen in Florida to discuss investing in PassNinja (a Florida company) and that, when Grundy dragged his feet, HF0 then coordinated with Bunsen to disrupt PassNinja's operations. *See, e.g.*, Declaration of Richard Grundy ("Grundy Decl.") [ECF No. 68-1] ¶ 16 ("I personally met with HF0 General Partner Fontenot in Miami at this time where Fontenot introduced me to his business, HF0."); *id.* ¶ 22 ("In or about early August 2024, HF0 invited PassNinja to come temporarily from Miami, Florida to San Francisco [to] interview for a million-dollar investment and residency opportunity at the Archbishop's Mansion. . . . PassNinja and I knew HF0 and its general partners Fontenot, Liu and Stites-Clayton from my former dealing with them in Florida."); *id.* ¶ 26 ("I have documented proof, including SMS text exchanges, in which Bunsen admitted his intention to use the PassNinja customer database with HF0 to establish this competing entity and poach existing clients."). There is, in short, a "strong relationship among [HF0], the forum, and the litigation," since the counterclaims arise out of HF0's

relationships with Bunsen and Grundy (two Florida citizens) and its attempt to invest in PassNinja (a Florida corporation) because of its intellectual property. *Ford Motor Co.*, 592 U.S. at 365 (cleaned up).

In response, HF0 directs us to *Oldfield v. Pueblo de Bahia Lora, S.A.*, where the Eleventh Circuit held that the relatedness prong isn't satisfied unless "the contact [is] a 'but-for' cause of the tort[.]" 558 F.3d 1222–23 (11th Cir. 2009); *accord* MTD at 7 ("A claim arises out of or relates to a defendant's contact with the forum state where the contact by the subject defendant 'is a but-for cause' of the claim and the claim is a 'foreseeable consequence' of that defendant's contact with the state."); Reply at 2 ("There is not a single shred of evidence in the record that any of HF0's contact[s] with Florida were the 'but-for cause' of Counterclaimants' claims."). But, as one of our colleagues correctly observed, "the Supreme Court did away with this view, explaining that the Court has 'never framed the specific jurisdiction inquiry as always requiring proof of causation—i.e., proof that the plaintiff's claim came about because of the defendant's in-state conduct.'" *Lewis v. Mercedes-Benz USA, LLC*, 530 F. Supp. 3d 1183, 1238 (S.D. Fla. 2021) (Ruiz, J.) (quoting *Ford Motor Co.*, 592 U.S. at 362).

Our focus, in other words, is not on whether there's "but-for" causation between the claims and the defendant's contacts with the forum state; it is instead on whether "the suit *arise[s] out of or relate[s]* to the defendant's contacts with the forum." *Ford Motor Co.*, 592 U.S. at 362 (cleaned up) (emphasis added); *see also id.* at 373 (Alito, J., concurring) ("Ford, however, asks us to adopt an unprecedented rule under which a defendant's contacts with the forum State must be proven to have been a but-for cause of the tort plaintiff's injury. The Court properly rejects that argument, and I agree with the main thrust of the Court's opinion."); *Del Valle*, 56 F.4th at 1276 ("[D]irect causation between the nonresident's forum contacts and the plaintiff's cause of action is not required[.]"). Since the counterclaims (at a minimum) *relate* to HF0's contacts with Florida, we conclude that the Counter-Plaintiffs have satisfied the relatedness prong of the due-process test.

*Second*, the Counter-Plaintiffs have shown that HF0 "purposely availed" itself of Florida's laws. "In cases (like this one) involving an intentional tort, two applicable tests can determine whether purposeful availment occurred: the effects test and the traditional minimum-contacts test." *SkyHop Techs., Inc. v. Narra*, 58 F.4th 1211, 1230 (11th Cir. 2023). Under the "effects test," a defendant's tortious act can establish purposeful availment when the act: "(1) was intentional; (2) was aimed at the forum state; and (3) caused harm that the defendant could have anticipated would be suffered in the forum state." *Mosseri*, 736 F.3d at 1356 (cleaned up). By contrast, "[t]he minimum contacts test assesses the nonresident defendant's contacts with the forum state and asks whether those contacts (1) are related to the plaintiff's cause of action; (2) involve some act by which the defendant purposefully availed himself of the privileges of doing business within the forum; and (3) are such that the defendant should reasonably anticipate being haled into court in the forum." *Del Valle*, 56 F.4th at 1276. The Counter-Plaintiffs must satisfy one of these two tests to establish purposeful availment. *See SkyHop Techs.*, 58 F.4th at 1230 ("Because either test suffices, and we conclude the effects test is satisfied, we do not consider the traditional minimum-contacts test.").

Because the Counter-Plaintiffs have satisfied the "effects test," there's no need to discuss the "minimum-contacts test." HF0 insists that the Counter-Plaintiffs "make no allegations that HF0 aimed any conduct at the State of Florida." MTD at 8; *see also ibid.* ("There are no allegations that HF0 held meetings in Florida, communicated directly with Florida residents regarding the alleged wrongdoing, actively participated in AccessNinja's allegedly improper operations in Florida, or engaged in any continuous or significant business conduct within the state."). That's absurd. The Amended Counterclaim repeatedly alleges that HF0 and Bunsen (a Florida resident) intentionally harmed PassNinja (a Florida corporation) for their own pecuniary gain by misappropriating PassNinja's intellectual property and interfering with its business relationships. *See, e.g.*, Amended Counterclaim ¶ 44 ("Bunsen had already planned with HF0 to set up a copycat company, exploiting

11

the programming code and customer contacts Bunsen had developed while working with PassNinja, and using the HF0 investment and HF0 resources and control."); *id.* ¶ 48 ("Bunsen admitted his and HF0's intention to use the PassNinja customer database to establish this competing entity and poach existing PassNinja clients."); *id.* ¶ 54 ("Bunsen specifically chose, and HF0 approved the name AccessNinja to misappropriate PassNinja's goodwill and trade on PassNinja's common law trademark rights in PassNinja™ by creating a false association between the companies and the misappropriated trade secrets and infringed copyrights.").[6] This kind of conduct—in which "HF0 actively supports AccessNinja and Bunsen's unlawful operations in Florida and . . . continues to induce AccessNinja and AccessNinja's customers in Florida to infringe the PassNinja Copyrights," Response at 2—is more than sufficient to meet the purposeful-availment prong under the "effects test." *See, e.g.*, *SkyHop Techs.*, 58 F.4th at 1230 ("Indyzen sent those emails to force SkyHop to pay additional funds so that SkyHop could regain control of its own property. It was certainly foreseeable to Indyzen that SkyHop would feel the harm from its alleged threats in Florida, where SkyHop is based. And that is especially true here since Indyzen knew, from the outset, that it was in a partnership with a Florida-based company."); *eLandia Int'l, Inc. v. Ah Koy*, 690 F. Supp. 2d 1317, 1338–39 (S.D. Fla. 2010) (Moreno, C.J.) ("[T]he Defendants were, according to the complaint, knowingly interfering with eLandia's business relationships, and knowingly conspiring to violate fiduciary duties owed to eLandia in Florida. . . . Their alleged tortious activity caused injury to eLandia, a Florida corporation, and Defendants knew that that injury would be borne in the State of Florida. . . . The effects test is clearly met under these

---

[6] These allegations are supported by Grundy's sworn declaration. *See* Grundy Decl. ¶ 26 ("Bunsen admitted his intention to use the PassNinja customer database with HF0 to establish this competing entity and poach existing clients."); *id.* ¶ 39 ("HF0 knew that Bunsen was previously working for PassNinja and that the source code belonged to PassNinja and that AccessNinja was [a] newly formed entity with a confusingly similar name created to unfairly compete with PassNinja. I know HF0 was aware of this because HF0 originally offered to invest in PassNinja, and during our 2024 residency interview process, I personally communicated PassNinja's intellectual property details to Fontenot, Stites-Clayton, and Liu.").

circumstances."); *Thursday LLC v. Klhip Inc.*, 2018 WL 4216389, at *7 (M.D. Fla. Sept. 5, 2018) (Honeywell, J.) ("According to the Amended Complaint, the Margiano Defendants, who acted on behalf of or in concert with Plaintiff's competitor, Klhip, acted 'deliberately' and 'for the purpose of' causing interruption to Plaintiff's business. . . . Plaintiff felt the effects of this harm in Florida, where its business is principally located." (cleaned up) (citing *Licciardello*, 544 F.3d at 1288)).

*       *       *

We agree with the Counter-Plaintiffs that we can exercise specific personal jurisdiction over HF0 without offending due process. The Counter-Plaintiffs have alleged (and established through sworn testimony) that their counterclaims "arise out of or relate to at least one of [HF0's] contacts with the forum" and that HF0 "purposely availed itself to the privilege of conducting activities" within Florida. *Mosseri*, 736 F.3d at 1355 (cleaned up). And HF0, for its part, declined to "make a compelling case that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice." *Ibid.* We thus **DENY** the MTD insofar as it asks us to dismiss the counterclaims against HF0 for lack of personal jurisdiction under Rule 12(b)(2).

## II.    Failure to State a Claim

### A. Contributory and Vicarious Copyright Infringement (Counts I and II)

Counts I and II of the Amended Counterclaim allege that HF0 is liable for contributory and vicarious infringement of two copyrights owned by PassNinja. *See* Amended Counterclaim ¶¶ 74, 89. According to the Counter-Plaintiffs, HF0 "actively encourage[d] and induce[d] the infringement of the [copyright registrations] by promoting and aiding and abetting AccessNinja's [infringing activities]" and then "directly benefit[ted] from the infringement of the copyrighted work[s]." *Id.* ¶¶ 74–75, 89–90. HF0 contends that these allegations are insufficient to state viable claim. Starting with contributory copyright infringement, HF0 says that the Counter-Plaintiffs' salient allegations are conclusory and "fail to allege that HF0 substantially participated [in] or materially contributed to any

13

infringement." MTD at 10. As for vicarious copyright infringement, HF0 insists that the Counter-Plaintiffs never "establish that HF0 had the right and ability to supervise the alleged infringing activities or that it profited directly from the infringing activity." *Id.* at 11. After careful review, we find that the Counter-Plaintiffs have *failed* to allege a plausible claim of vicarious copyright infringement—though they've done just enough to state a viable claim of contributory copyright infringement. We separately find, however, that both Counts I and II must be dismissed because each count improperly comingles three distinct causes of action.

A claim of copyright infringement may be brought in three different ways. "To establish [direct] copyright infringement, 'two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Oravec v. Sunny Isles Luxury Ventures, L.C.*, 527 F.3d 1218, 1223 (11th Cir. 2008) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)). While a direct copyright infringement claim may be brought under the Copyright Act, "common law principles" also allow the owner of a copyright to impose "secondary liability on a theory of contributory or vicarious liability" so that it can "enforce [its] rights in the protected work effectively[.]" *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.* (*MGM*), 545 U.S. 913, 930 (2005). "To prevail on a claim for contributory copyright infringement, the plaintiff must allege two elements: '(i) direct infringement and (ii) intentional inducement or encouragement.' . . . To allege intentional inducement or encouragement . . . the plaintiff must [show] that the defendant is 'one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another.'" *AccessNinja*, 2025 WL 753332, at *4 (first quoting *Microsoft Corp. v. Guirguis*, 2022 WL 1664181, at *3 (S.D. Fla. Mar. 30, 2022) (Altonaga, C.J.); and then quoting *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 845 (11th Cir. 1990)). To assert a claim of vicarious infringement, "a plaintiff must allege that the defendant 'infringes vicariously by profiting from direct infringement

14

while declining to exercise a right to stop or limit it.'" *Disney Enters., Inc. v. Hotfile Corp.*, 798 F. Supp. 2d 1303, 1310 (S.D. Fla. 2011) (Jordan, J.) (quoting *MGM*, 545 U.S. at 930).

Before we get into HF0's arguments, we'll *sua sponte* strike Counts I and II because they transform the Amended Counterclaim into a shotgun pleading. *See Cramer v. State of Fla.*, 117 F.3d 1258, 1263 (11th Cir. 1997) ("[T]he district court, acting on its own initiative, should have stricken appellants' complaints and instructed counsel to replead their cases[.] . . . As we have stated on several other occasions, shotgun complaints of the sort filed in these cases are altogether unacceptable."). Counts I of II of the Amended Counterclaim fall into the "third category" of shotgun pleadings the Eleventh Circuit has identified because they "fail[ ] to separate into a different count each cause of action[.]" *Embree v. Wyndham Worldwide Corp.*, 779 F. App'x 658, 662 (11th Cir. 2019) (citing *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1322–23 (11th Cir. 2015)). Counts I and II, after all, each cram claims of direct copyright infringement, contributory copyright infringement, and vicarious copyright infringement into one count. *See* Amended Counterclaim at 14, 17. As we just discussed, however, these are "different causes of action with distinct elements requiring separate findings[,]" so "combin[ing] these causes of action into a single count" creates a shotgun pleading. *Finch v. Carnival Corp.*, 701 F. Supp. 3d 1272, 1283–84 (S.D. Fla. 2023) (Bloom, J.); *see also, e.g.*, *AccessNinja*, 2025 WL 753332, at *2 (correctly separating claims of direct copyright infringement and contributory copyright infringement into two counts). Putting aside the arguments the parties advanced in the MTD, therefore, we find that Counts I and II must be stricken and that the Counter-Plaintiffs should be allowed to plead their three theories of copyright infringement as separate counts. *See Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1357 (11th Cir. 2018) ("We have explained that in a case in which a party, plaintiff or defendant, files a shotgun pleading, the district court should strike the pleading and instruct counsel to replead the case—if counsel could in good faith make the representations required by FED. R. CIV. P. 11(b)." (cleaned up)).

15

Pleading deficiencies aside, we'll also take up HF0's merits-based arguments to guide the Counter-Plaintiffs' coming amendment. HF0 claims that the allegations in the Amended Counterclaim are too conclusory to support claims of contributory copyright infringement or vicarious copyright infringement. *See* MTD at 10 ("The allegations purporting to establish HF0's material contribution to copyright infringement are simply conclusions with no factual support."); *id.* at 11 ("[The allegations are] insufficient to establish that HF0 had the right and ability to supervise the alleged infringing activities or that it profited directly from the infringing activity."). We agree with HF0 as to the vicarious copyright infringement claims. To assert this kind of copyright claim, the Counter-Plaintiffs were required to plead that "the defendant profits directly from the infringement and has a right and ability to supervise the direct infringer, even if the defendant initially lacks knowledge of the infringement." *MGM*, 545 U.S. at 930 n.9. To establish "control," the Counter-Plaintiffs must show "that [HF0] has both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so." *Diaz v. Edi Korta, LLC*, 2024 WL 3425710, at *11 (S.D. Fla. July 15, 2024) (Elfenbein, Mag. J.) (quoting *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1173 (9th Cir. 2007)), *report and recommendation adopted*, 2024 WL 3636641 (S.D. Fla. Aug. 2, 2024) (Leibowitz, J.).

But the Amended Counterclaim only alleges that, "[o]n information and belief, through its relationship with AccessNinja and Bunsen, HF0 has the ability to control and will directly profit from AccessNinja and Bunsen's infringements and misappropriation." Amended Counterclaim ¶ 66; *see also id.* ¶ 63 ("HF0 for its own perceived financial benefit provided Bunsen and AccessNinja with offices, support, housing, supervision for AccessNinja employees/founders, technical infrastructure, servers, and staff all controlled by HF0 to support AccessNinja and Bunsen's misappropriation and infringement of PassNinja's intellectual property[.]"). This is woefully insufficient. "While 'information and belief' pleading can sometimes survive a motion to dismiss, a plaintiff must allege specific facts to support a claim. . . . Conclusory allegations made upon information and belief are not

entitled to the presumption of truth, and allegations stated upon information and belief that do not contain any factual support fail to meet the *Twombly* standard." *Scott v. Experian Info. Sols., Inc.*, 2018 WL 3360754, at *6 (S.D. Fla. June 29, 2018) (Altonaga, J.) (cleaned up). We agree with HF0 that there aren't any non-conclusory allegations "pleading HF0's right and ability to supervise the allegedly infringing conduct. Nor do [the Counter-Plaintiffs] identify any allegation showing that HF0 had a financial interest in such activities other than HF0's indirect financial interest through its investment in AccessNinja." Reply at 5–6. Although the Amended Counterclaim successfully pleads that HF0 provides financial support to AccessNinja, *see* Amended Counterclaim ¶ 63, it lacks any plausible allegations that HF0: (1) directly profits from AccessNinja's infringement; and (2) has the power to *supervise* or *direct* AccessNinja's allegedly infringing activities. Without these essential allegations, the Counter-Plaintiffs haven't pled a viable vicarious copyright infringement claim. *See Diaz*, 2024 WL 3425710, at *11 ("The only allegation supporting this element is Plaintiffs' statement that Defendants had 'the right and ability to supervise' the general public's infringing activity. But this conclusory statement standing alone is just that, a conclusion. It does not explain the extent to which and in what capacity Defendants have 'the right and ability to supervise' the infringing activity or how they have the practical ability to do so."); *Myeress v. Heidenry*, 2019 WL 7956172, at *7 (S.D. Fla. Nov. 25, 2019) (Becerra, Mag. J.) ("The Complaint alleges that 'Defendant MDLV profited from the direct infringement of the exclusive rights of Plaintiff in the Photograph at issue in this case under the Copyright Act while declining to exercise a right to stop it.' Such [a] conclusory allegation, without more, even if assumed to be true and seen in the light most favorable to Plaintiff, is insufficient to plausibly state a claim for vicarious copyright infringement against MDLV." (cleaned up)), *report and recommendation adopted*, 2019 WL 7956171 (S.D. Fla. Dec. 10, 2019) (Ruiz, J.).

We come out the other way, however, on the Counter-Plaintiffs' contributory copyright infringement claims. "Contributory infringement necessarily must follow a finding of direct or primary

infringement." *Cable/Home Comm'n*, 902 F.2d at 845. If there has been direct infringement, a third-party can *also* be liable under a theory of contributory infringement if it has "knowledge of the infringing activity" and "induces, causes or materially contributes to the infringing conduct of another." *Ibid.* (quoting *Casella v. Morris*, 820 F.2d 362, 365 (11th Cir. 1987)). "[A]ctual knowledge is not required. All that must be shown is that [HF0] had reason to know." *Id.* at 846. HF0 concedes that the Counter-Plaintiffs have adequately alleged direct infringement but argues that the Amended Counterclaim "does not provide any factual basis for inferring what specific copyrighted works HF0 allegedly knew were being infringed, when HF0 acquired this knowledge, or how HF0 came to possess such knowledge." MTD at 9.

We disagree. *First*, the Amended Counterclaim explains *how* HF0 knew (or, at least, should have known) that Bunsen and AccessNinja were misappropriating intellectual property that rightfully belonged to PassNinja. *See, e.g.*, Amended Counterclaim ¶¶ 35–36 ("On August 19, 2024, HF0 paid for Bunsen and Grundy to travel to San Francisco to conduct the interview. . . . At least at that time, . . . HF0 knew that PassNinja had proprietary software protected by copyright and that PassNinja used the PassNinja and Ninja trademarks in conjunction with the PassNinja SaaS for PassNinja customers."); *id.* ¶ 44 ("Bunsen had already planned with HF0 to set up a copycat company, exploiting the programming code and customer contacts Bunsen had developed while working with PassNinja, and using the HF0 investment and HF0 resources and control."); *id.* ¶ 48 ("Bunsen admitted his and HF0's intention to use the PassNinja customer database to establish [AccessNinja] and poach existing PassNinja clients.").

*Second*, the Counter-Plaintiffs plausibly allege that HF0 materially contributed to this infringement by providing Bunsen with the financial resources to create AccessNinja—a company that would enrich both HF0 and Bunsen through the "theft of [PassNinja's] intellectual property" and by "poach[ing] existing PassNinja clients." *Id.* ¶ 48; *see also id.* ¶ 43 ("Bunsen then revealed that HF0

was only willing to invest with him so he would be taking the HF0 investment with another company that would not [sic] exclude Grundy and PassNinja."); *id.* ¶ 63 ("[HF0] provided Bunsen and AccessNinja with offices, support, housing, supervision for AccessNinja employees/founders, technical infrastructure, servers, and staff all controlled by HF0 to support AccessNinja and Bunsen's misappropriation and infringement of PassNinja's intellectual property[.]"). HF0 counters that "funding or even providing support resources to a company later accused of infringement" isn't enough, and that there must be allegations that "HF0 purposefully directed and facilitated copyright infringement" (*i.e.*, by "assist[ing] in copying code," "develop[ing] infringing features," or "provid[ing] specialized tools necessary for infringement"). MTD at 10.

This is an overly rigid understanding of what constitutes "material contribution." As HF0 recognizes, "[e]vidence of active steps taken to encourage direct infringement" *includes* (but is not limited to) "advertising an infringing use or instructing how to engage in an infringing use, show[ing] an affirmative intent that the product be used to infringe, and a showing that infringement was encouraged[.]" *MGM*, 545 U.S. at 936. The Amended Counterclaim alleges that HF0, at a minimum, encouraged Bunsen to form AccessNinja and use PassNinja's intellectual property by giving him the financial and technical support to do so—that's plainly enough for now. *See Cable/Home Commc'n*, 902 F.2d at 846 ("Kenny encouraged the duplication of the CMS program of the U–30 chip by giving funds and equipment to Bepko and Ward in order to break the VideoCipher®II."); *accord In re Napster, Inc. Copyright Litig.*, 2001 WL 36593841, at *3 n.4 (C.D. Cal. July 9, 2001) (agreeing that "provid[ing] funds and equipment to facilitate the duplication" is sufficient to show "substantial participation in the alleged infringement"). In sum, the Counter-Plaintiffs have successfully pled a contributory copyright infringement claim.

To summarize our findings, we **STRIKE** Counts I and II because they impermissibly commingle claims of direct copyright infringement, contributory copyright infringement, and

vicarious copyright infringement into one count. We also find that the Counter-Plaintiffs' allegations fail to state a vicarious copyright infringement claim on which relief may be granted. We will, however, allow the Counter-Plaintiffs (if they can) to file a second amended counterclaim and replead these copyright claims correctly and in accordance with this Order.

### B. Unfair Competition (Count VI)

Count VI of the Amended Counterclaim asserts a Florida common law claim of "unfair competition" against all three Defendants. Amended Counterclaim at 25. "To state a claim for unfair competition under Florida common law[,] a party must plead (1) deceptive or fraudulent conduct of a competitor and (2) likelihood of consumer confusion." *Third Party Verification, Inc. v. Signaturelink, Inc.*, 492 F. Supp. 2d 1314, 1324 (M.D. Fla. 2007) (Conway, J.) (citing *M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486, 1494 (11th Cir. 1990)). Unlike "unfair competition" claims brought under federal law, "[c]ourts endeavoring to map the contours of Florida's elastic unfair competition cause of action have recognized that the precise elements of the claim are somewhat elusive." *Alphamed Pharma. Corp. v. Arriva Pharma., Inc.*, 432 F. Supp. 2d 1319, 1353 (S.D. Fla. 2006) (Altonaga, J.), *aff'd*, 294 F. App'x 501 (11th Cir. 2008).

The Counter-Plaintiffs allege that HF0 engaged in unfair competition by "unlawfully us[ing] intellectual property belonging to PassNinja to obtain competitive advantage for their own products and services in the market[,]" "pass[ing] off PassNinja's work as [their] own intellectual property[,]" and "marketing . . . competing products under marks [that are] likely to be confused with PassNinja[.]" Amended Counterclaim ¶¶ 137–40. HF0 argues that Count VI fails to state an unfair competition claim because it "offers no specific allegations that HF0 engaged in any deceptive conduct whatsoever." MTD at 12; *see also ibid.* ("Counterclaimants impermissibly lump HF0 together with the other counterclaim-defendants as 'AccessNinja Defendants' to mask this fatal deficiency. This group

pleading tactic cannot salvage a claim devoid of facts showing that HF0—as distinct from the other defendants—engaged in any marketplace deception."). We disagree.

"The fact that defendants are accused collectively does not render the complaint deficient. The complaint can be fairly read to aver that all defendants are responsible for the alleged conduct." *Kyle K. v. Chapman*, 208 F.3d 940, 944 (11th Cir. 2000). The Amended Counterclaim, fairly read, alleges that HF0, together with AccessNinja and Bunsen, engaged in deceptive or fraudulent conduct by "pass[ing] off PassNinja's work as [its] own intellectual property[,]" Amended Counterclaim ¶ 138, and that consumers were likely confused by the "marketing of competing products" with similar marks, *id.* ¶ 140. Since the Counter-Plaintiffs allege that HF0 engaged in deceptive conduct that's likely to confuse consumers, it has stated a plausible unfair competition claim under Florida law. We therefore **DENY** the MTD as to Count VI.

### C. Misappropriation of Trade Secrets (Counts VII)

The Counter-Plaintiffs allege in Count VII that HF0 misappropriated PassNinja's trade secrets (namely its "Source Code, customer lists/information, development plans and other propriety information") in violation of FUTSA. *Id.* ¶ 144. HF0 argues that Count VII doesn't state a plausible claim because: (1) "the Amended Counterclaim fails to identify with any specificity which trade secrets HF0 allegedly received"; (2) "the Amended Counterclaim fails to adequately allege either theory of misappropriation—i.e., acquisition or disclosure—under FUTSA"; and (3) "there are no non-conclusory factual allegations whatsoever that HF0 knew or had reason to know that such information was acquired through improper means—a required element under FUTSA." MTD at 13–14. Because we find HF0's third argument persuasive, we'll dismiss Count VII on that basis.

"To state a claim under FUTSA, a plaintiff must allege that '(1) it possessed a trade secret and (2) the secret was misappropriated.'" *AccessNinja*, 2025 WL 753332, at *5 (quoting *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 898 F.3d 1279, 1297 (11th Cir. 2018)). A "trade secret" includes any

"information, including a formula, pattern, compilation, program, device, method, technique, or process" that "[d]erives independent economic value . . . from not being generally known to . . . other persons" and is "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *Yellowfin Yachts*, 898 F.3d at 1297 (quoting FLA. STAT. § 688.002(4)(a)–(b)). "Misappropriation," on the other hand, "is defined as the acquisition of a secret 'by someone who knows or has reason to know that the secret was improperly obtained or who used improper means to obtain it.'" *Ibid.* (quoting *Advantor Sys. Corp. v. DRS Tech. Servs., Inc.*, 678 F. App'x 839, 853 (11th Cir. 2017)). A party can "misappropriate another's trade secret by either acquisition, disclosure, or use." *Compulife Software Inc. v. Newman* (*Compulife I*), 959 F.3d 1288, 1311 (11th Cir. 2020). Misappropriation by acquisition happens "when [the defendant] acquires [the trade secret] 'and knows or has reason to know that the trade secret was acquired by improper means.'" *Ibid.* (quoting FLA. STAT. § 688.002(2)(a)).

Misappropriation by use and misapplication by disclosure have nearly identical elements. They occur when a person uses or discloses a trade secret "without consent" and then either: "(1) use[s] improper means to acquire the trade secret; (2) at the time of use knew or had reason to know that it was (a) derived from a person who used improper means, (b) acquired in a manner giving rise to a duty to maintain secrecy, or (c) derived from a person who owed a duty to maintain secrecy to the owner; or (3) before a material change in his position, knew or had reason to know that it was a trade secret and had been acquired by accident or mistake." *Compulife Software, Inc. v. Newman* (*Compulife II*), 111 F.4th 1147, 1162 (11th Cir. 2024) (citing FLA. STAT. § 688.002(2)(b)).

Before we get to HF0's winning argument, we'll briefly explain why we're unpersuaded by the other two. *First*, the Amended Counterclaim adequately describes the trade secrets that are at issue in our case. It explains that Bunsen "stole PassNinja's Source Code, customer lists/information, development plans and other proprietary information[,]" Amended Counterclaim ¶ 144, and that this

information was "proprietary" and "confidential[,]" *id.* ¶ 45. We thus find that the Counter-Plaintiffs have "describe[d] the misappropriated trade secrets with 'reasonable particularly.'" *Treco Int'l S.A. v. Kromka*, 706 F. Supp. 2d 1283, 1286 (S.D. Fla. 2010) (King, J.). *Second*, Count VII's allegations aren't conclusory. The Counter-Plaintiffs allege that HF0 "knew that PassNinja had proprietary software protected by copyright" after they met with Bunsen and Grundy on August 19, 2024, Amended Counterclaim ¶ 36, and that PassNinja encouraged Bunsen to unlawfully obtain this information through "lawfare, corporate sabotage and cyber-attacks[,]" *id.* ¶ 45. Contra HF0's view, then, that the Counter-Plaintiffs are only alleging that "HF0 is an investor in AccessNinja[,]" MTD at 14, the Amended Counterclaim plausibly alleges that HF0 knew (or should have known) that Grundy obtained certain PassNinja trade secrets through illicit means.

Even so, we must dismiss Count VII because the Counter-Plaintiffs fail to allege any facts showing that HF0 (as opposed to AccessNinja or Bunsen) misappropriated PassNinja's trade secrets through "acquisition, disclosure, or use." *Compulife I*, 959 F.3d at 1311. In its only allegation on this point, the Amended Counterclaim alleges that, "[o]n information and belief, Bunsen and AccessNinja have shared the trade secrets with [HF0] or at least threaten to do so." Amended Counterclaim ¶ 148. While HF0 has arguably shown that HF0 knows that PassNinja's "trade secret[s] [were] acquired by improper means," it never alleges—beyond mere speculation and conjecture—that HF0 has *acquired* PassNinja's trade secrets. *Compulife I*, 959 F.3d at 1311; *see also Border Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330, 1339 (M.D. Fla. 2006) (Corrigan, J.) ("Plaintiffs further conclude, without providing any factual basis, that Merwin then disclosed these purported trade secrets to Ryan and Flyaway and Murphy, who, in turn, sent them to the Putnam County Police Department. These conclusory allegations amount to nothing more than rank speculation[.]"). At best, Count VII suggests that HF0 knowingly supported AccessNinja and Bunsen with the understanding that they would misappropriate PassNinja's trade secrets. *See* Response at 7 ("HF0 was and is aware of the Agreement and Bunsen's

obligations to PassNinja, yet HF0 has intentionally induced and encouraged Bunsen to form AccessNinja to misappropriate those trade secrets outside of PassNinja."). But the Counter-Plaintiffs can't maintain a FUTSA claim against HF0 itself without showing that HF0 *also* misappropriated PassNinja's trade secrets through acquisition, disclosure, or use. *Cf. Compulife II*, 111 F.4th at 1161 ("[W]e will consider whether Compulife's database constituted a trade secret, and second, we will consider whether the defendants misappropriated it."); *see also, e.g.*, *Knights Armament Co. v. Optical Sys. Tech., Inc.*, 568 F. Supp. 2d 1369, 1377 (M.D. Fla. 2008) (Conway, J.) ("OSTI states that the Knights Defendants had access to trade secrets through business dealings that exposed them to OSTI's facilities and products. However, OSTI gives no further details as to how the Knights Defendants allegedly used the trade secrets. . . . OSTI's bare allegations in the counterclaim that the Knights Defendants committed trade secret misappropriation lack factual support and cannot survive a motion to dismiss." (cleaned up)).

Because the Counter-Plaintiffs haven't shown that HF0 misappropriated their trade secrets, they can't state a claim under FUTSA. We therefore **DISMISS** Count VII.

### D.  Tortious Interference (Count VIII)

Count VIII of the Amended Counterclaim contends that HF0 tortiously interfered with "PassNinja's existing and future business relationships regarding services and products related to PassNinja's inter alia [sic] NFC solutions, digital pass management, and digital wallet integration." Amended Counterclaim ¶ 157. HF0 accomplished this, the Counter-Plaintiffs allege, by encouraging "Bunsen to breach [his] fiduciary obligations to PassNinja" and by providing Bunsen and AccessNinja with "funding, housing, food, support office and staff to further the infringement, unfair competition and misappropriation of PassNinja intellectual property." *Id.* ¶ 156.

"Under Florida law, 'the elements of tortious interference with a business relationship are (1) the existence of a business relationship; (2) knowledge of the relationship on the part of the defendant;

(3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship.'" *Duty Free Ams., Inc. v. Estee Lauder Cos., Inc.*, 797 F.3d 1248, 1279 (11th Cir. 2015) (cleaned up) (quoting *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994)). HF0 argues that the Counter-Plaintiffs: (1) "fail[ ] to identify any specific business relationship with which HF0 allegedly interfered[,]" MTD at 15; (2) don't show that "HF0 engaged in intentional and unjustified interference[,]" *id.* at 16; and (3) "cannot allege that HF0's alleged interference directly caused any damages [sic] to them[,]" *id.* at 18. We agree with HF0's first and third arguments.

Florida law requires a plaintiff to identify the specific business relationship the defendant allegedly interfered with. *See N. Am. Van Lines, Inc. v. Ferguson Transp., Inc.*, 639 So. 2d 32, 33 (Fla. 4th DCA 1994) ("The business relationship must be with an identifiable person and not with the public at large."), *aff'd*, 687 So. 2d 821 (Fla. 1996); *see also U.S.B. Acquisition Co., Inc. v. Stamm*, 660 So. 2d 1075, 1081 (Fla. 4th DCA 1995) ("There was no evidence that Appellees interfered with any ongoing business relationship between the buyer and any identifiable person or entity, an essential element."). The Counter-Plaintiffs allege, in a conclusory way, that HF0's acts "disrupt[ed] PassNinja's existing and future business relationships"—without identifying *what* these relationships were or *how* they were negatively affected by HF0's "investment and active participation in the infringement and misappropriation[.]" Amended Counterclaim ¶¶ 157, 159. These barebones allegations are therefore insufficient under Florida law. *See Bortell v. White Mountains Ins. Grp., Ltd.*, 2 So. 3d 1041, 1048 (Fla. 4th DCA 2009) ("The defendants all allege that the complaint is legally insufficient because it does not identify with any specificity the parties with whom Bortell claims interference by merely stating that they constitute a group of 'finite marine clients.' We agree."); *Locked Offroad, LLC v. Carbon Shock Tech., Inc.*, 2023 WL 3121346, at *3 (M.D. Fla. Mar. 14, 2023) (Scriven, J.) ("Moreover, it is well-settled that a business's relationship with the general consuming public is not protected; instead, the asserted

relationship must be with an identifiable customer."); *Emergency Recovery, Inc. v. Gov't Emps. Ins. Co.*, 773 F. Supp. 3d 1304, 1310 (M.D. Fla. 2025) (Mizelle, J.) ("To the extent ERI continues to assert tortious interference with ERI's relationship to 'the community at large'—or unspecified 'vendors, contractors and subcontractors'—the claim fails[.]"). This defect, standing alone, is sufficient for us to dismiss Count VIII.[7]

We reject HF0's position, however, that the "Counterclaimants have not alleged that HF0 engaged in intentional or unjustified interference." MTD at 16. Here's what we've said about this "third element" of the tort before:

> "The third element, intentional and unjustified interference with a business relationship, requires the plaintiff to allege that 'the defendant acted without justification.'" *Duty Free Ams.*, 797 F.3d at 1280 (quoting *Sec. Title Guar. Corp. of Balt. v. McDill Columbus Corp.*, 543 So. 2d 852, 855 (Fla. 2d DCA 1989)). Crucially, in assessing whether a party's interference was unjustified, "Florida recognizes a 'privilege of interference.'" *Id.* (quoting *Wackenhut Corp. v. Maimone*, 389 So. 2d 656, 657–58 (Fla. 4th DCA 1980)). This privilege of interference embodies the fundamental principle that a competitor can go after business for itself: "[t]here can be no claim for tortious interference with a business relationship where the action complained of is undertaken to safeguard or promote one's financial or economic interest." *Gunder's Auto Ctr. v. State Farm Mut. Auto. Ins. Co.*, 422 F. App'x 819, 822 (11th Cir. 2011) (quoting *Barco Holdings, LLC v. Terminal Inv. Corp.*, 967 So. 2d 281, 293 (Fla. 3d DCA 2007)).
>
> [. . . .]
>
> [T]his privilege to compete is "qualified." *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1294 n.9 (11th Cir. 2001). In particular, the privilege can be overcome in two circumstances. *First*, a party can overcome the competition privilege by proving that "the defendant's motive was *purely* malicious." *KMS Rest. Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321, 1327 (11th Cir. 2004) (emphasis added). *Second*, a tortious-interference claim can survive the privilege "if improper methods were used." *Id.*; *see also Duty Free Ams.*, 797 F.3d at 1280 (noting that interference is privileged "unless the [claimant] alleges a purely malicious motive divorced from any legitimate competitive economic interest" or "adequately alleges improper methods" (cleaned up)). The idea (of course)

---

[7] The Counter-Plaintiffs' failure to plead this element also means that they haven't shown "damage . . . as a result of the breach of the relationship." *Duty Free Ams.*, 797 F.3d at 1279. The "damage" the Counter-Plaintiffs rely on is the diminished "value of PassNinja's intellectual property," which then harmed PassNinja's "existing or prospective business relationships[.]" Amended Counterclaim ¶ 170. But, without explaining what these business relationships look like, the Counter-Plaintiffs *can't* show "that the defendant's conduct caused or induced the breach that resulted in the plaintiff's damages." *Chi. Title Ins. Co. v. Alday-Donaldson Title Co. of Fla., Inc.*, 832 So. 2d 810, 814 (Fla. 2d DCA 2002).

is that, while companies may freely compete for business, that competition becomes tortious when it's grounded in an improper purpose or method.

*Shenzhen Kinwong Elec. Co., Ltd. v. Kukreja*, 574 F. Supp. 3d 1191, 1213 (S.D. Fla. 2021) (Altman, J.). HF0 denies that it had any "malicious motive" and insists that its decision to financially back Bunsen and AccessNinja to PassNinja's detriment was a pure (and honest) business decision. *See* MTD at 18 ("Counterclaimants allege that HF0 invited PassNinja to interview for a $1,000,000.00 investment opportunity, paid for Bunsen and Grundy to travel to San Francisco, and ultimately chose to invest in AccessNinja. This is simply not the type of conduct that is sufficiently 'improper' to support a tortious interference claim.").

We agree, though, with the Counter-Plaintiffs that HF0 is downplaying (perhaps ignoring) the Amended Counterclaim's gravest allegations. The Counter-Plaintiffs contend that HF0 "was not . . . a mere passive investor in a lawful business" but was instead *knowingly* encouraging Bunsen and AccessNinja to "infringe PassNinja's intellectual property" and using "Bunsen's access to PassNinja's proprietary source code and customer relationships" to solicit new customers for AccessNinja—all to PassNinja's detriment. Response at 8, 10; *see also* Amended Counterclaim ¶ 156 ("HF0 encouraged and supported Bunsen to breach the Agreement and Bunsen's fiduciary obligations to PassNinja. HF0 provided Bunsen with funding, housing, food, support office and staff to further the infringement, unfair competition and misappropriation of PassNinja intellectual property. HF0 encouraged Bunsen to use the newly created alter-ego AccessNinja to hijack and sabotage existing and prospective PassNinja customer relationships knowing that AccessNinja and Bunsen had no legitimate right to PassNinja's trade secrets, copyrights and trademarks."). While these allegations aren't enough to establish that HF0's motives were "purely malicious," they *are* sufficient to show that "improper methods were used." *KMS Rest.*, 361 F.3d at 1327.

"Improper methods include physical violence, misrepresentations, illegal conduct, and threats of illegal conduct." *Kukreja*, 574 F. Supp. 3d at 1214 (cleaned up) (quoting *Duty Free Ams.*, 797 F.3d at

1280 n.9). The Counter-Plaintiffs claim that HF0 conspired with Bunsen not only to misappropriate PassNinja's intellectual property and trade secrets—thereby breaching Bunsen's fiduciary duty to PassNinja—but also to sabotage PassNinja by deleting "staging server instances" and "crippling key PassNinja systems." Amended Counterclaim ¶ 46. No matter how you slice it, this kind of conduct is undoubtedly "improper." *See Collier HMA Physician Mgmt., LLC v. NCH Healthcare Sys., Inc.*, 2019 WL 277733, at \*9 (M.D. Fla. Jan. 22, 2019) ("Plaintiffs have alleged Defendants employed improper means, such as misrepresentations, conspiratorial conduct, and purposeful breach of contract in order to procure the employment of the PMRG physicians.").

Although the Counter-Plaintiffs plausibly allege that HF0's interference was unjustified, they failed to show that this interference affected any of their business relationships. We therefore **DISMISS** Count VIII.

### E.  Unjust Enrichment (Count XI)

Finally, in Count XI, the Counter-Plaintiffs claim that HF0 (and the other Counter-Defendants) were unjustly enriched when they "accepted and retained the benefit of [PassNinja's intellectual property and trade secrets]" under inequitable circumstances. Amended Counterclaim ¶ 185. "To prevail on its unjust enrichment claim, [the Counter-Plaintiffs] had to prove that [they] conferred a benefit on [HF0], that [HF0] appreciated the benefit, and that [HF0's] acceptance and retention of the benefit under the circumstances made it 'inequitable for [it] to retain it without paying the value thereof.'" *Taxinet Corp. v. Leon*, 114 F.4th 1212, 1219 (11th Cir. 2024) (quoting *Pincus v. Am. Traffic Sols., Inc.*, 333 So. 3d 1095, 1097 (Fla. 2022)). "[T]o prevail on an unjust enrichment claim, the plaintiff must directly confer a benefit to the defendant." *Kopel v. Kopel*, 229 So. 3d 812, 818 (Fla. 2017). While "no direct contact is required for a direct benefit to be conferred[,]" *Melton v. Century Arms, Inc.*, 243 F. Supp. 3d 1290, 1307 (S.D. Fla. 2017) (Moreno, J.), "[i]t is not enough to show that the defendant obtained a benefit and that the plaintiff was in some roundabout way damaged[,]" *Caldwell v. Compass*

*Enter. Grp. LLC*, 2016 WL 7136181, at *2 (M.D. Fla. Feb. 4, 2016) (Mendoza, J.) (citing *Century Senior Servs. v. Consumer Health Benefit Ass'n, Inc.*, 770 F. Supp. 2d 1261, 1267 (S.D. Fla. 2011) (Martinez, J.)).

HF0's argument here is simple: "PassNinja does not allege—nor can it—that it ever bestowed any direct benefit on HF0." MTD at 20. We agree. Here, the "benefit" allegedly conferred on HF0 was access to PassNinja's "source code, passwords, trade secrets, proprietary customer information, development plans, partnerships and business opportunities." Amended Counterclaim ¶ 181. But the Counter-Plaintiffs admit that it was Bunsen, not PassNinja, that "provided [these assets] to AccessNinja and HF0." *Id.* ¶ 182. Moreover, while the Counter-Plaintiffs maintain that HF0 "knowingly induced . . . Bunsen and AccessNinja's actions[,]" the "direct benefits" HF0 received from this alleged inducement are "a potential return on investment for the illegal infringement" and "AccessNinja's participation in HF0's Residency with HF0's staff and other residents." Response at 11. While the Counter-Plaintiffs have certainly pled that they conferred a direct benefit on Bunsen (by providing him with access to PassNinja's intellectual property and trade secrets), Bunsen's decision to provide that information to HF0 in exchange for financial support isn't a "benefit" that flowed directly from PassNinja to HF0. *Cf. Century Senior Servs.*, 770 F. Supp. 2d at 1267 ("In this case, the language of Magnolia's counterclaim does not include any allegation of a benefit conferred directly onto CSS; it claims that the benefits were 'derived' from Magnolia's sales. . . . [A]ny benefit CSS gained from Magnolia was likely indirectly derived through other corporations doing business with Magnolia."); *Peoples Nat'l Bank of Commerce v. First Union Nat'l Bank of Fla., N.A.*, 667 So. 2d 876, 879 (Fla. 3d DCA 1996) ("Here, the plaintiff, Peoples National, could not and did not allege that it had directly conferred a benefit on the defendants, the other participant lenders. In actuality, if any benefit was conferred

upon each participant lender in the form of overpayments, it could only have been conferred upon them by Southeast, not Peoples National.").[8] For this reason, we **DISMISS** Count XI.

CONCLUSION

Accordingly, we **ORDER and ADJUDGE** that HF0's Motion to Dismiss the Amended Counterclaim [ECF No. 71] is **GRANTED in part** and **DENIED in part** as follows:

1. We **DENY** HF0's request to dismiss the Amended Counterclaim under Rule 12(b)(2) for lack of personal jurisdiction.

2. We also **DENY** HF0's request to dismiss Count VI of the Amended Counterclaim for failure to state a claim under Rule 12(b)(6).

3. Counts I and II are **STRICKEN**. The Counter-Plaintiffs may replead these claims in a way that comports with this Order.

4. Counts VII, VIII, and XI are **DISMISSED without prejudice**. The Counter-Plaintiffs may amend these counts in a way that complies with this Order.[9]

---

[8] In some cases, judges in our District *have* allowed unjust-enrichment claims to proceed "where the plaintiff alleges conferral of a benefit on a defendant through an intermediary." *Wilson v. EverBank, N.A.*, 77 F. Supp. 3d 1202, 1237 (S.D. Fla. 2015) (Bloom, J.). But we don't think Bunsen constitutes an "intermediary" in the circumstances of our case. Bunsen received the benefit of PassNinja's assets years before he allegedly misappropriated them at the behest of HF0. The "intermediary" exception prevents a defendant from "defeating any unjust enrichment claim" by "launder[ing] the benefit" through a third party. *Williams v. Wells Fargo Bank N.A.*, 2011 WL 4368980, at *9 n.5 (S.D. Fla. Sept. 19, 2011) (Altonaga, J.); *see also Peebles v. GrassMasters Prop. Mgmt., Inc.*, 384 So. 3d 287, 289–90 (Fla. 3d DCA 2023) (Bokor, J., concurring) ("I believe the law permits an unjust enrichment claim against a third party . . . where the contracted party acts as an intermediary for unjustly enriching and directly benefiting the third party. . . . But this isn't a pass-through situation directly benefiting a third party."). In our case, Bunsen took a benefit PassNinja conferred on him and shared it with HF0 much later; the benefit thus didn't merely pass through Bunsen as part of an inevitable journey to HF0.

[9] We could dismiss these claims *with prejudice*. *See AccessNinja*, 2025 WL 753332, at *6 ("A dismissal under Rule 12(b)(6) is normally 'on the merits and with prejudice,' and we are 'not required to grant a plaintiff leave to amend his complaint sua sponte when the plaintiff, who is represented by counsel, never filed a motion to amend or requested leave to amend before the district court[.]'" (first quoting *White v. Lemma*, 947 F.3d 1373, 1377 (11th Cir. 2020); and them quoting *Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542 (11th Cir. 2002) (en banc))). But we'll exercise our "broad discretion" to grant the Counter-Plaintiffs leave to amend their counterclaims since we extended that same courtesy to the other side. *See ibid.* (citing *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1270 (11th Cir. 2006)).

5. The Counter-Plaintiffs shall file their Second Amended Counterclaim within **fourteen days** of this Order. The Counter-Defendants shall respond to the Second Amended Counterclaim within **fourteen days** of it being served.

**DONE AND ORDERED** in the Southern District of Florida on July 31, 2025.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record